Eugene Clayton **PHELPS**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–10709.

Court of Appeals of Alaska.

July 23, 2010.

Cynthia L. Strout, Anchorage, for the Appellant.

James J. Fayette, Assistant District Attorney, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

---

Before COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

This case requires us to re-examine and apply the *Neal–Mutschler* rule—the rule that, when a defendant is being sentenced for two or more crimes, the defendant's composite sentence of imprisonment may not exceed the maximum sentence of imprisonment for the defendant's single most serious offense unless the sentencing judge affirmatively finds that a longer term of imprisonment is necessary to protect the public. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981); *Powell v. State*, 88 P.3d 532, 537 & n. 9 (Alaska App.2004).

In the present case, the defendant was convicted of four class A misdemeanors, each with a maximum sentence of 1 year's imprisonment. Thus, the *Neal* ceiling was 1 year. The sentencing judge affirmatively found that the need to protect the public did *not* require a sentence of more than 1 year. Nevertheless, the judge concluded that the facts of the case required a more severe sentence—and, accordingly, he sentenced the defendant to a composite term of 545 days (*i.e.*, approximately 1½ years).

As we explain in more detail in this opinion, we conclude that the facts of this case provide sufficient justification for imposing a more severe composite sentence than the 1–year *Neal* ceiling. Even though *Neal* seemingly allows only one justification for such a sentence (*viz.*, the need to protect the public), the Alaska Supreme Court's post–*Neal* decisions show that the court has altered its position regarding sentencing benchmark rules. In its more recent sentencing decisions—in particular, *State v. Hodari*, 996 P.2d 1230 (Alaska 2000), *State v. Bumpus*, 820 P.2d 298 (Alaska 1991), and *State v. Wentz*, 805 P.2d 962 (Alaska 1991)—the supreme court has declared that appellate courts should not place inflexible restrictions on a sentencing judge's authority based on pre-established criteria. Instead, the supreme court has taken the position that sentencing benchmarks serve only as guidelines, and that any sentencing decision ultimately must be justified on the particular facts of a defendant's offense and background, evaluated in light of the sentencing criteria codified in AS 12.55.005 and the range of sentences authorized by the legislature.

Based on *Hodari, Bumpus,* and *Wentz,* we conclude that the *Neal* rule must be construed in a manner flexible enough to encompass other compelling justifications for a longer sentence. And given the facts of the present case (as found by the district court), we conclude that the district court had a compelling justification for imposing a sentence exceeding 1 year to serve.

### Underlying facts

In 1994, Eugene Clayton Phelps was on trial for three counts of aggravated indecent exposure, former AS 11.41.460. This offense, a class A misdemeanor, was defined as knowingly exposing one's genitals in the presence of another person under 16 years of age, acting with reckless disregard for the offensive, insulting, or frightening effect that this conduct may have.[1]

Phelps was charged with exposing himself and masturbating at the bedside of his girlfriend's teenage daughter between December 1990 and March 1991, when the girl was 13 and 14 years old. On the first day of Phelps's trial, the State made an offer of proof (outside the presence of the jury) in support of its motion to be allowed to present evidence of other bad acts. Specifically, the State presented the testimony of the victim's older sister, who told the court that, over the course of several months in 1988, Phelps had masturbated at her bedside and had attempted to engage in sexual penetration with her. The victim's sister was 15 years old at the time.

The day after the victim's sister presented this *in camera* testimony, Phelps failed to

---

1. At the time of Phelps's offenses, there was a single crime of indecent exposure. Effective June 11, 1998, the Alaska Legislature split the offense into two degrees, one a felony and the other a misdemeanor. *See* SLA 1998, ch. 81, §§ 3–4, which enacted AS 11.41.458 and amended AS 11.41.460.

appear for trial. His trial continued without him, and Phelps was convicted of the three counts of indecent exposure—although, of course, he was not sentenced at that time. Nearly sixteen years later, Phelps was located and taken into custody. At that time, he was tried for, and convicted of, misdemeanor failure to appear, AS 12.30.060.

*Phelps's sentencing hearing in the district court*

Each of Phelps's four offenses (the three counts of indecent exposure, and the single count of failure to appear) carried a maximum penalty of 1 year's imprisonment.[2] Phelps was sentenced for all four crimes at a consolidated sentencing hearing before District Court Judge J. Patrick Hanley.

Judge Hanley found that Phelps had masturbated in front of the younger sister (*i.e.,* the named victim in the three indecent exposure counts) approximately one dozen times, and that Phelps would watch her when she slept. Judge Hanley also found that Phelps's crimes took an emotional toll on the victim and on her family. The victim began wearing a swimsuit when she bathed, so that Phelps would not see her naked if he came into the bathroom, and she affixed a wind chime to her bedroom door, so that she would know if Phelps entered her room during the night.

Judge Hanley found that Phelps's conduct was among the most serious types of indecent exposure, both because of the conduct itself and also because of its emotional effect on the victim and the divide that it created in the victim's family. Weighing the *Chaney* sentencing criteria now codified in AS 12.55.005,[3] Judge Hanley declared that there was "no doubt in [his] mind that the ... criteria of community condemnation and deterrence of Mr. Phelps requires a ... substantial jail sentence, and [his offense] does constitute the worst offense of the types of [conduct encompassed within] indecent exposure."

Having found that Phelps's crime of indecent exposure was among the worst offenses within the definition of that crime, Judge Hanley then addressed the *Neal–Mutschler* rule, as interpreted by Judge Singleton (a former judge of this Court) in his concurrence in *Peruski v. State,* 711 P.2d 573, 575 (Alaska App.1985):

> *The Court:* [My finding] leads us ... next [to] the [*Neal-*]*Mutschler* rule.... [Under that rule,] in order to impose consecutive sentences that exceed the [1–year] maximum sentence for the single most serious count, the sentencing court must expressly find that the [greater] term of imprisonment is necessary for the protection of the public[,] ... and [that] the defendant can neither be rehabilitated nor deterred by a shorter sentence.... [I]t's a pretty strong rule[, and it can not be satisfied by] the [sentencing] judge's perception of a need for the deterrence of other wrongdoers or the affirmation of community norms.

Judge Hanley noted that there was no evidence that Phelps had engaged in further sexual misconduct—indeed, further criminal activity of any kind—during the more than fifteen years between the time he absconded from his trial and the time he was caught and arrested. Based on the fact that Phelps had apparently been law-abiding for the immediately preceding fifteen years, Judge Hanley concluded that he could not, in good faith, find that Phelps could not be rehabilitated or deterred by a sentence of 1 year or less, or that the protection of the public required a composite sentence of more than 1 year's imprisonment.

Accordingly, Judge Hanley ruled that even though Phelps's acts of indecent exposure were among the most serious offenses within the definition of that crime, Phelps's sentences for these three counts of indecent exposure should not cumulatively exceed 1 year.

---

**2.** *See* AS 12.55.135(a) (setting the maximum penalty for class A misdemeanors) and AS 12.30.060(2) (setting the maximum penalty for failure to appear in connection with a misdemeanor).

**3.** *See State v. Chaney,* 477 P.2d 441, 443–44 (Alaska 1970).

However, Judge Hanley then turned to Phelps's separate offense of failure to appear.

Judge Hanley noted that if Phelps's sentence for this crime was included within the *Neal–Mutschler* rule—in other words, if the judge was barred from giving Phelps additional jail time for this offense, over and above the 1 year that the judge believed was the proper composite prison term for Phelps's three acts of indecent exposure—then this result would seemingly conflict with the doctrine that a defendant should normally receive consecutive jail time for crimes of escape or failure to appear. *See Walton v. State,* 568 P.2d 981, 986 (Alaska 1977); *Hayes v. State,* 790 P.2d 713, 717 (Alaska App.1990).

Judge Hanley noted that Phelps's act of failing to appear "wasn't a garden-variety failure to appear at a pre-trial conference, or even [at] a trial call". Instead, Phelps's failure to appear was significantly more serious—because (as Judge Hanley found) Phelps committed this offense "after [his] trial had begun, [and] after [he] . . . hear[d] what the [other crimes] evidence was, . . . and after he . . . reach[ed] the conclusion that it wasn't looking good for him".

Judge Hanley concluded that Phelps's failure to appear also was serious for a separate reason: "the effect that it had on other people". Because Phelps absconded in the middle of trial, he remained unsentenced (and his whereabouts remained unknown) for more than 15 years. Judge Hanley found that, as a result of the unfinished status of the criminal prosecution against Phelps, the emotional problems that the victim and her sister experienced as a result of Phelps's underlying conduct (his acts of indecent exposure) were exacerbated and prolonged.

Based on all of this, Judge Hanley concluded that Phelps should receive a composite sentence of more than 1 year's imprisonment for the three acts of indecent exposure and the separate act of failure to appear:

> *The Court:* [Phelps's] indecent exposures are so significant that they require . . . [a sentence of] one year in jail[, just] for those. . . . [His] failure to appear is significant also. . . . [But] if that [offense is] governed by [*Neal-*]*Mutschler*, it would

be as if nothing ever happened [to Phelps] because of it. It [would] be [as if] it was never considered in [Phelps's] sentencing and never reflected in [his sentence].

> . . .

> [I conclude] that if there is no consequence [to Phelps] for the failure to appear, [that] would frustrate the sentencing criteria [codified in AS 12.55.005]. . . . [It] would have the same effect as if he had no conviction for failure to appear.

> . . .

> And so, for those reasons, [even though] the indecent exposure [sentences] are bound by the [*Neal-*]*Mutschler* rule, . . . I don't think that the failure to appear sentence [is covered by that rule]. . . . [And] I am going to make [the failure to appear sentence] consecutive to the indecent exposure [sentences] for those reasons.

Judge Hanley then sentenced Phelps to serve a total of 365 days on the three indecent exposure counts, with a consecutive 180 days for the failure to appear count. In other words, Phelps received a total of 1½ years to serve for his four offenses.

*Why we uphold the district court's sentencing decision*

On appeal, Phelps argues that Judge Hanley violated the *Neal–Mutschler* rule when he imposed a composite sentence of more than 1 year (the maximum sentence for any single one of Phelps's crimes) after explicitly finding that a sentence of more than 1 year was *not* required by the sentencing goal of protecting the public.

Almost thirty years ago, in *Neal v. State,* 628 P.2d 19 (Alaska 1981), the Alaska Supreme Court endorsed the rule that a sentencing judge should not impose a composite sentence exceeding the maximum term of imprisonment that could be imposed for the defendant's single most serious offense unless the judge "make[s] a formal finding that confinement for the combined term is necessary to protect the public". *Id.* at 21.

This sentencing rule was derived from the American Bar Association's "Standards Relating to Sentencing Alternatives and Proce-

dures" (Approved Draft, 1968), § 3.4(b)(iv): "Imposition of a consecutive sentence should require the affirmative action of the sentencing court. The court should be authorized to impose a consecutive sentence only after a finding that confinement for such a term is necessary in order to protect the public from further criminal conduct by the defendant." (Quoted in footnote 3 of *Neal*, 628 P.2d at 20.)

(For many years, this Court referred to the supreme court's sentencing rule as the *"Mutschler"* rule, even though the supreme court expressly declined to reach this issue in *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977), and did not adopt the rule until *Neal*. For the last several years, this Court has referred to the rule using the names of both supreme court decisions: the *"Neal–Mutschler"* rule.)

This Court has repeatedly applied the *Neal–Mutschler* rule to both felony sentences and misdemeanor sentences.[4] However, in the years since the *Neal* decision, both the Alaska Supreme Court and the American Bar Association have reconsidered their approach to the type of sentencing rule epitomized by *Neal–Mutschler*—that is, a rule that sets an absolute limit on a sentencing judge's discretion (in addition to the limits already contained in the pertinent sentencing statutes) unless the record supports one specific finding: that a greater sentence is necessary to protect the public from the continuing danger posed by the defendant.

*(a) The American Bar Association's changed policy toward consecutive sentences*

The American Bar Association's 1968 "Standards Relating to Sentencing Alternatives and Procedures" have been superseded by the "Standards for Criminal Justice: Sentencing". The most recent version of the ABA's Sentencing Standards is the third edition, approved by the ABA House of Delegates in February 1993 and published in 1994.[5]

This current edition of the ABA Sentencing Standards contains no provision like former Standard 3.4(b)(iv) which the supreme court relied on in *Neal*—that is, no provision prohibiting sentencing judges from imposing a composite sentence above a specified level of severity unless the judge affirmatively finds that a more severe sentence is necessary to protect the public. This is no accident: the current ABA Standards disavow this position and, instead, the ABA now advocates different policies to govern situations where a defendant is being sentenced for more than one offense.

ABA Sentencing Standard 18–3.7, "Convictions of multiple offenses", states that an offender who is convicted of multiple offenses should receive a composite sentence "that appropriately takes into account all of the offender's current offenses". *See* § 18–3.7(a).

Under Standard 18–3.7, when the defendant's crimes are all part of a single criminal episode, "sentencing courts should not ... increase the severity of [the defendant's composite sentence] merely as a result of the number of counts or charges made from [that] single episode", *see* § 18–3.7(b)(ii), and the defendant's composite sentence should reflect "[a] level of severity that take[s] into account the fact that the separate offenses occurred as part of [a single] episode." *See* § 18–3.7(b)(iii).

The ABA continues to recommend that when a defendant is being sentenced for two or more offenses that are *not* all part of a single episode, the baseline sentence "should be derived by reference to the sentence appropriate for the [defendant's] most serious offense." § 18–3.7(d). However, the ABA no longer endorses a rule forbidding a judge from exceeding the sentence for the defendant's most serious offense except in special

---

**4.** *See, e.g., Tice v. State*, 199 P.3d 1175, 1178 (Alaska App.2008); *Vandergriff v. State*, 125 P.3d 360, 363–64 (Alaska App.2005); *Powell v. State*, 88 P.3d 532, 537–38 (Alaska App.2004) (felony cases); *Peruski v. State*, 711 P.2d 573, 574 (Alaska App.1985); *Brown v. State*, 693 P.2d 324, 331 (Alaska App.1984) (misdemeanor cases).

**5.** The text of these Standards (without the accompanying commentary) is available at the American Bar Association's web site:

http://new.abanet.org/sections/criminaljustice/Pages/Standards.aspx

situations. Rather, § 18–3.7(d) declares that if the sentencing judge determines that a more severe sentence is appropriate, "the enhancement should ordinarily be determined as if the other current offenses were treated as part of the offender's criminal history or as factors aggravating the [defendant's] most serious offense."

(See also Standard 18–6.5, "Sentencing for more than one offense", which reiterates these guidelines.)

In the "History of Standard" section that accompanies Sentencing Standard 18–3.7, the ABA explains its new position on this issue:

[I]n contrast to the second edition [of the sentencing standards], the current Standards do not continue the policy of premising the most severe sanctions on a finding of the offender's future dangerousness. *See* former Standard 18–4.5(b)(iv) (consecutive sentences available only when [the] court finds "that confinement for such a term is necessary in order to protect the public from further serious criminal conduct by the defendant").

ABA Standards for Criminal Justice, Sentencing (3rd ed. 1994), p. 71.

The footnote that accompanies this text states that "[t]his former policy is rejected consistently in the new Standards", and the footnote directs readers to the Commentary to Standard 18–3.5 ("Criminal history; recidivism") for an explanation of the ABA's reasons for abandoning this policy.

The Commentary to Sentencing Standard 18–3.5 explains that the former policy concerning consecutive sentencing was premised on the idea that courts would use lengthy terms of incarceration to "selectively incapacitate those offenders who present[ed] the greatest danger to the public." ABA Sentencing Standards (3rd ed. 1994), p. 61. However, the ABA was led to re-examine this premise because of the "disappointing" results of "considerable research ... performed in the 1980s to test the power of [a defendant's] criminal history, and other variables, to predict future dangerousness." *Ibid.* The results of this research were "disappointing" because, even though past offenders are, as a group, more likely to re-

offend, "attempts to make predictions about [particular] individuals within the group [based on these criteria were] more often wrong than right". *Ibid.*

The Commentary to Sentencing Standard 18–3.5 concludes with these observations:

This [third] edition of the Standards rejects prior ABA policy that the operation of habitual offender statutes should turn upon a specific finding of "a substantial possibility of future serious criminal conduct by the defendant." As discussed above, research has failed to develop reliable predictors of future dangerousness in individual cases.... [W]e have no empirical tool to make such judgments.

ABA Sentencing Standards, p. 64.

Returning, then, to Standard 18–3.7 (the standard dealing with consecutive sentencing), the Commentary to this standard declares that the ABA's goal was to steer a course between fully consecutive sentences for multiple crimes, which "can result in sentences of extraordinary harshness", and the former policy of generally limiting a defendant's composite sentence to the amount of imprisonment that the defendant could receive for their most serious crime—a policy that "[made] the remaining counts ... 'free' as far as determination of the [defendant's] sentence [was] concerned." *Id.* at 72. Rather, the current standard "advocates an approach to ... sentencings for multiple convictions that is neither [presumptively] consecutive nor [presumptively] concurrent." *Ibid.*

Under this revised policy, "multiple offenses normally ought to be punished more harshly than single offenses", but not through the "stacking" of the individual sentences. *Ibid.* Instead, the sentence for the defendant's most serious offense is used as "a foundation", with principled enhancements for the defendant's other offenses, so that, in the words of § 18–3.7(a), the defendant's composite sentence "appropriately takes into account all of the offender's current offenses".

(This is similar to the rule that this Court employs when reviewing a defendant's composite term of imprisonment for two or more

criminal convictions: we assess whether the combined sentence is clearly mistaken, given the whole of the defendant's conduct and criminal history. *See Brown v. State*, 12 P.3d 201, 210 (Alaska App.2000); *Comegys v. State*, 747 P.2d 554, 558–59 (Alaska App. 1987).)

### (b) *The Alaska Supreme Court's policy toward benchmark sentencing rules*

Although we believe it is significant that the American Bar Association no longer endorses its former strict limitation on consecutive sentences, the new approach taken by the ABA in its current Sentencing Standards does not alter the fact that we are an intermediate appellate court, and that we have no authority to change a sentencing rule established by our supreme court, even though the supreme court relied on the ABA standards when it promulgated that rule and even though the ABA now advocates a different approach. The ABA's altered approach to consecutive sentencing would simply be an interesting footnote to this discussion if we were not also convinced that, in the years since the Alaska Supreme Court issued its decision in *Neal*, the supreme court has changed its position on the issue of benchmark sentencing rules.

In the last twenty years, the supreme court has repeatedly declared that sentencing benchmarks must not be applied in a manner that places inflexible restrictions on a sentencing judge's authority based on pre-established criteria. Rather, even though sentencing benchmarks provide useful guidelines for the exercise of sentencing discretion, these benchmarks must allow for exceptions based on the particular facts of unusual cases. The supreme court's altered approach to benchmark sentencing rules is reflected in a series of three decisions: *State v. Wentz*, 805 P.2d 962 (Alaska 1991), *State v. Bumpus*, 820 P.2d 298 (Alaska 1991), and *State v. Hodari*, 996 P.2d 1230 (Alaska 2000).

*Wentz* involved a defendant who was sentenced to serve 12 years for a severe assault on his wife.[6] This Court reversed Wentz's sentence and directed the superior court to impose a sentence of 10 years or less. In reaching this decision, we relied on a sentencing guideline that we and the Alaska Supreme Court had developed in several previous decisions.[7]

This "10–year" rule originated in the Alaska Supreme Court's decision in *Donlun v. State*, 527 P.2d 472 (Alaska 1974), as modified six years later in *Pascoe v. State*, 628 P.2d 547 (Alaska 1980). In *Donlun*, our supreme court adopted the ABA's recommendation that maximum terms of imprisonment should not exceed 5 years except for cases involving particularly serious offenses, dangerous offenders, or professional criminals.[8] Later, in *Pascoe*, the supreme court endorsed the ABA's modified recommendation that sentences of imprisonment normally should not exceed 5 years, and that sentences of greater than 10 years should be reserved for "unusual cases".[9] And in *Skrepich v. State*, 740 P.2d 950 (Alaska App.1987), this Court relied on the ABA's definition of "habitual offender"[10] to support our definition of which cases would qualify as "unusual" under the *Pascoe* rule (*i.e.*, situations where the defendant's composite sentence might exceed 10 years). We held that, normally, a composite sentence exceeding 10 years was permissible only when the offender "ha[d] previously been convicted of [felonies] for which a sentence [of] at least one full year of incarceration was imposed." *Skrepich*, 740 P.2d at 956.

---

6. *Wentz*, 805 P.2d at 962–63.

7. *See Wentz v. State*, 777 P.2d 213, 215–16 (Alaska App.1989).

8. *Donlun*, 527 P.2d at 475. *See* former ABA "Sentencing Alternatives and Procedures" Standard 2.1 (1968), cited in footnote 9 of *Donlun*, · 527 P.2d at 475.

9. *Pascoe*, 628 P.2d at 550, citing the 1971 version of ABA Sentencing Standard 2.1.

10. Under former ABA Sentencing Standard 18–4.4(c) (1982), a "habitual offender" was one who had been convicted of at least two prior felonies (committed on different occasions) within five years of the current offense, and who had previously served a sentence of greater than 1 year's imprisonment. (Cited in *Skrepich*, 740 P.2d at 956.)

In our decision in *Wentz*, we relied on this sentencing rule to reach the conclusion that Wentz's sentence should not exceed 10 years' imprisonment. Even though Wentz had an extensive misdemeanor record, and even though the sentencing judge found (based on prior failed attempts at rehabilitation) that Wentz was a dangerous offender who needed to be isolated to protect the public, this Court held that the 10–year ceiling applied to Wentz's composite sentence because Wentz had no felony record. 777 P.2d at 216.

When Wentz's case went to the Alaska Supreme Court, the supreme court disapproved this 10–year sentencing ceiling—not just in Wentz's case, but as a general rule. The court gave two reasons for its decision: first, the 10–year ceiling unjustifiedly restricted the superior court's sentencing discretion within the statutory framework established by the legislature; and second, the 10–year ceiling was "contrary to [the supreme court's own] prior decisions concerning the proper role of appellate courts in reviewing sentencing decisions." [11]

With regard to the first reason (the unjustified restriction on the superior court's statutory sentencing authority), the supreme court noted that the 10–year ceiling "[had the] practical effect of ... reduc[ing] by two-thirds the range of acceptable sentences expressly authorized by the legislature [for Wentz's felonies]".[12]

The supreme court then noted that the narrow category of exceptions to the 10–year ceiling (*i.e.*, the exceptions for defendants who had previously served substantial sentences for felony offenses, or who were guilty of premeditated attempts to kill or injure) was inconsistent with the legislature's codification of a broad range of aggravating factors in AS 12.55.155(c):

The legislative scheme allows imprisonment for up to twenty years for class A felonies, upon proof of one or more of *twenty-six* enumerated aggravating factors. *See* AS 12.55.125; AS 12.55.155(c)(1)-(26). Under the court of appeals' ruling, a trial court cannot sentence an offender to the maximum term, regardless of the presence, strength, or number of statutory aggravating factors, unless it can demonstrate that the case meets one of the two exceptions to the court of appeals' ten-year rule. We hold that such a result is in direct conflict with the language of the statute and is therefore impermissible.

*Wentz*, 805 P.2d at 965 (emphasis in the original).

With regard to the second reason (the departure from the proper role of an appellate court in reviewing sentencing decisions), the supreme court declared:

There are drawbacks ... to relying too heavily on appellate review to articulate sentencing principles and to fine-tune sentences. Appellate review by its very nature is backward-looking. It is the proper role of the appellate court to examine what has occurred in a specific case, and to pass on the propriety of the result in that case only. It is generally accepted that an appellate court is effective only when it decides cases based on the factual record before it and only after the record in that case has been completely developed. As a rule, it cannot and should not anticipate what other factual situations might arise in the future, nor should it fashion rules prospectively.

*Wentz*, 805 P.2d at 967, n. 6.[13]

The supreme court cautioned that any benchmark sentencing rule had to be sufficiently flexible to allow a sentencing judge to reach a fair sentence based on the particular facts of an individual defendant's case, even though the defendant's case might not fit neatly into the categories of aggravated cases that the appellate court had foreseen when it established the benchmark:

Whether a particular offense is sufficiently serious to justify placing it in the upper rather than lower end of the sentencing range ... cannot be determined

---

11. *Wentz*, 805 P.2d at 965.

12. *Ibid.*

13. Quoting Susanne DiPietro, *The Development of Appellate Sentencing Law in Alaska*, 7 Alaska L. Rev. 265, 296 (1990).

with mathematical certainty. Such questions are not easily resolved by resort to "bright line" rules or pronouncements concerning the "correct" sentence to be applied under varying factual circumstances. For example, it cannot be stated categorically that a felony assault committed by an offender with a long string of prior misdemeanor assaults is necessarily less serious than a felony assault committed by an offender with a single prior felony conviction. Such questions must be answered by reference to the particular facts of the individual case, and are therefore matters properly left to the sound discretion of the sentencing judge.

*Wentz,* 805 P.2d at 966.

Because the supreme court concluded that the "rigid approach" embodied in the 10-year sentencing ceiling was inconsistent with the principle of individualized sentencing described in the preceding quotation, and because the court concluded that the 10-year ceiling "artificially group[ed] substantially different offenses and offenders together in the lower end of the authorized sentencing range", the court disapproved the 10-year rule. *Ibid.*

The supreme court then cited this Court's *Austin* rule—the benchmark sentencing rule for first felony offenders that this Court adopted in *Austin v. State,* 627 P.2d 657 (Alaska App.1981)—as an example of a proper benchmark rule which conformed to the principles the supreme court had endorsed:

[W]e do not mean to suggest that the court of appeals may not adopt any standards in order to guide the trial courts in the exercise of their discretion in sentencing. On the contrary, in *Karr v. State,* 686 P.2d 1192, 1195 (Alaska 1984), we applied, without disapproval, the court of appeals' longstanding "*Austin* rule," which provides that "[n]ormally a first [felony] offender should receive a more favorable sentence than the presumptive sentence for a second [felony] offender." ... As the court of appeals observed in *Austin,* however, [this rule does] not suggest "that a first offender [may] *never* receive more time to serve than the presumptive term for a second

offender"; it merely limit[s] application of the higher term to the "exceptional case." [*Austin,* 627 P.2d] at 658.

Properly applied[,] the "exceptional case" standard enunciated in *Austin* allows the trial court sufficient discretion to exceed the presumptive term for second felony offenders where a particularly compelling set of aggravating factors (AS 12.55.155) or [the] *Chaney* criteria (AS 12.55.005) militate in favor of an increased sentence.

*Wentz,* 805 P.2d at 966-67. (The emphasis of the word "never" was added by the supreme court; it is not in the original quotation from *Austin* ).

Shortly after the supreme court issued its decision in *Wentz,* the supreme court directed this Court to reconsider our sentencing decision in *Williams v. State,* 800 P.2d 955 (Alaska App.1990), in light of *Wentz.*

In our first *Williams* decision (the one cited in the preceding paragraph), this Court established three benchmark sentencing categories for cases involving a kidnapping and an accompanying sexual assault. The first benchmark—sentences of no more than 20 years to serve—was for first offenders. The second benchmark—sentences of between 20 and 30 years—was for defendants with at least one felony conviction but with insufficient criminal history to be considered "dangerous offenders" within the definition found (at that time) in the ABA Sentencing Standards.[14] The third benchmark—sentences exceeding 30 years—was for "cases [that] involved kidnappings of prolonged duration or offenders whose prior criminal histories established them as persistent, violent criminals." *Williams,* 800 P.2d at 958-960.

After the supreme court directed us to reconsider these benchmark sentencing categories, we issued our decision in *Williams II—i.e., Williams v. State,* 809 P.2d 931 (Alaska App.1991). In that second *Williams* decision, depending on the reader's viewpoint, we either clarified or backed away from the benchmark sentencing rules an-

**14.** *See* footnote 5 of the *Williams* opinion, 800      P.2d at 959.

nounced in the first *Williams* decision. Here is what we said about benchmarks:

> [I]n *Williams*[,] we did not purport to formulate or apply any hard and fast sentencing rule restricting the appropriate sentence for a broad class of disparate offenders or limiting the factors that could properly be taken into account in deciding the relative seriousness of a particular case. Instead, [we] collected past sentencing decisions involving offenders convicted of crimes generally similar to Williams's and organized [those past decisions] into benchmark sentencing ranges . . . [to] provide assistance and guidance to sentencing courts faced with difficult sentencing decisions in comparable cases.
>
> Our benchmarks in *Williams* and other cases are not intended to be inflexible rules confining the permissible range of a sentence in a given case; rather, they are meant to act as historically-based starting points for individualized analysis in each case[.] ["]A basic precept of sentencing [continues to be that] the defendant's sentence must be based upon an individualized consideration of the offender and the offense.["] *McPherson v. State,* 800 P.2d 928, 933 (Alaska App.1990) (Bryner, C.J., concurring and dissenting).

*Williams II,* 809 P.2d at 933.

We then summed up our view of sentencing benchmarks. We declared that benchmark sentencing rules "are meant only to provide a framework" for an individualized analysis of the facts of a defendant's case in light of the applicable sentencing criteria originally specified in *State v. Chaney,* 477 P.2d 441, 443–44 (Alaska 1970), and now codified in AS 12.55.005. We immediately added:

> If the language of our original opinion in this case, or any of our other cases, suggests that sentencing benchmarks establish hard and fast limits, we disapprove that language. We similarly disapprove any language in this or prior cases suggesting that the benchmarks we have described can only be deviated from when

certain specific, limited exceptions are established. We stress that any sound reason may be relied on to differentiate one case from another. The legitimate role of benchmarks is to promote careful consideration of whether actual differences exist between a given case and prior, generally similar cases, and to encourage courts to make clear their reliance on those differences when they do exist.

*Williams II,* 809 P.2d at 933–34.

Shortly after this Court issued our clarification of the principles governing the use of benchmark sentencing ranges in *Williams II,* the supreme court had occasion to again disapprove this Court's use of sentencing benchmarks. The case was *State v. Bumpus,* 820 P.2d 298 (Alaska 1991).

*Bumpus* involved a defendant who committed a series of burglaries and thefts, and who received a composite sentence of 23 years' imprisonment.[15] This Court found that the superior court had failed to justify a sentence of this severity for a non-violent offender, and we directed the superior court to reduce Bumpus's sentence to no more than 15 years to serve (more specifically, 20 years with 5 years suspended).[16]

The supreme court agreed with this Court that the superior court had failed to adequately analyze Bumpus's sentence, but the supreme court also concluded that this Court's 15–year sentencing ceiling was unjustified.[17] In particular, the supreme court disapproved of this Court's prior decisions in which we held that, among the sentencing goals codified in AS 12.55.005, only the sentencing goal of protecting the public—as opposed to the other sentencing goals of rehabilitation, deterrence (both of the defendant and of others), and the reaffirmation of societal norms—could normally justify a sentence exceeding 10 years to serve.

Here is what the supreme court said on this issue:

> The court of appeals noted that [the sentencing judge] "placed great reliance on the sentencing goals of deterrence, com-

---

**15.** *Bumpus,* 820 P.2d at 299–300.

**16.** *Id.* at 300–01, 305.

**17.** *Id.* at 305.

munity condemnation, and isolation." [However, citing] its own [prior] decisions and this court's decision in *Pears v. State*, 698 P.2d 1198 (Alaska 1985), the court of appeals ... concluded that [the sentencing] goals [of deterrence and community condemnation] could never support imposition of [the] twenty-three-year aggregate term [of imprisonment imposed in Bumpus's case].

The [court of appeals'] conclusion is no longer valid in the wake of this court's decision in *State v. Wentz*, 805 P.2d 962 (Alaska 1991), where we stated that dicta in *Pears* purporting to limit the circumstances under which sentences may exceed ten years could not be applied beyond the particular facts of that case. [*Wentz*, 805 P.2d] at 966 n. 5.

*Wentz* established that it is no longer appropriate for courts to rigidly define the length of sentence that can be justified by any particular criterion, provided that the sentence is ultimately within the range allowed by the legislature.

*Bumpus*, 820 P.2d at 302 (footnote omitted).

See also *Griffin v. State*, 9 P.3d 301, 308 (Alaska App.2000), where this Court expressly acknowledged that the supreme court's decision in *Bumpus* abrogated the earlier 10-year sentencing guideline based on the ABA sentencing standard.

Thus, *Bumpus* reiterated the *Wentz* decision's criticism of sentencing rules that "rigidly define the length of sentence that can be justified by any particular criterion". But, perhaps more important to our decision of Phelps's case, the *Bumpus* decision contains a footnote in which the supreme court questioned the continued vitality of the *Neal–Mutschler* rule (although the court did not refer to the rule by this name):

> The public defender, [appearing] as *amicus curiae*, also [relies on] the [Court of Appeals's] requirement that sentences which exceed the maximum term for the [defendant's] most serious offense—here,

ten years—must be based on the need to isolate the defendant for the entire sentence. *Contreras v. State*, 767 P.2d 1169, 1174 (Alaska App.1989). The vitality of this "rule" is also open to question after *Wentz* ....

*Bumpus*, 820 P.2d at 302 n. 5.

As can be seen from the text of this footnote, the supreme court erroneously attributed the *Neal–Mutschler* sentencing rule to this Court, rather than acknowledging that the rule is derived from its own decision in *Neal*. However, this does not alter the fact that the supreme court apparently viewed its decisions in *Wentz* and *Bumpus* as inconsistent with *Neal*.

Eight and a half years after its decision in *Bumpus*, the Alaska Supreme Court revisited the issue of sentencing benchmarks in *State v. Hodari*, 996 P.2d 1230 (Alaska 2000). *Hodari* involved a defendant who broke into a house and then robbed, raped, and brutalized a mother and her pregnant daughter, while forcing the mother's other child (a fourteen-year-old boy) to watch.[18] The superior court sentenced Hodari to a composite sentence of 55 years' imprisonment, but this Court reversed Hodari's sentence and directed the superior court to impose no more than 40 years.[19] We acknowledged that Hodari's crimes were "aggravated" and "deserving of a ... severe sentence", but we held that Hodari's composite sentence could not exceed 40 years to serve because "we have approved composite terms of forty years or more only for violent crimes committed by offenders with backgrounds that included habitual criminality or repeated acts of criminal violence"—criteria that were not present in Hodari's background.[20]

The supreme court reversed this Court's decision, characterizing this Court's analysis of Hodari's case as "the kind of formulaic 'benchmark' sentencing" that the supreme court rejected in *Wentz*, and that we ourselves disavowed in *Williams II*.[21] The supreme court approvingly quoted this Court's own post-*Wentz* discussion of benchmark

---

18. *Hodari*, 996 P.2d at 1231.

19. *Hodari v. State*, 954 P.2d 1048, 1052 (Alaska App.1998).

20. *Id.* at 1051–52.

21. *Hodari II*, 996 P.2d at 1236.

sentencing rules in *Ross v. State*, 877 P.2d 777 (Alaska App.1994):

> [Benchmark sentencing rules are] a mechanism to protect against the disparate treatment of similarly situated offenders when sound reason for disparity cannot be found. At the same time, however, ... sentencing benchmarks [are,] at most[,] ... an imprecise starting point for determining appropriate sentences in individual cases. Sentencing benchmarks place no hard and fast restrictions on the scope of the sentencing court's authority in any given case.

*Hodari*, 996 P.2d at 1237 (quoting *Ross*, 877 P.2d at 780) (emphasis omitted).

In *Hodari*, the supreme court reiterated what it said in *Wentz*: that the question of "[w]hether a particular offense is sufficiently serious to justify placing it in the upper rather than [the] lower end of the sentencing range ... cannot be determined with mathematical certainty[, or answered] by resort to 'bright line' rules or pronouncements concerning the 'correct' sentence to be applied under varying factual circumstances." *Id.* at 1235.[22]

#### (c) Our assessment of the district court's sentencing decision in Phelps's case, and our re-assessment of the Neal rule, based on the supreme court's post-Neal decisions

Now that we have examined the Alaska Supreme Court's jurisprudence on the issue of benchmark sentencing rules, we turn to what is seemingly the last bright-line sentencing rule remaining under Alaska law: the supreme court's own sentencing rule in *Neal*.

As we have explained, *Neal* declares that a defendant's composite sentence for two or more crimes can not exceed the maximum term of imprisonment for the defendant's single most serious offense unless the more severe sentence is justified by one particular sentencing goal: the need to protect the public from the defendant's continued criminal acts—or, as this goal is phrased in AS 12.55.005(3), "the need to confine the defendant to prevent further harm to the public".

In the past, this Court has indicated that *Neal* must be applied to the letter—that a sentence above the *Neal* ceiling can be justified only by the need to protect the public, and not by any other sentencing goal such as community condemnation of the defendant's conduct or reaffirmation of societal values. *See, e.g., Peruski v. State*, 711 P.2d 573, 575 (Alaska App.1985) (Singleton, J., concurring), *Brown v. State*, 693 P.2d 324, 331 (Singleton, J., concurring).

But the goal of protecting the public from the defendant's further crimes is but one of the seven sentencing goals listed in AS 12.55.005.[23] As the supreme court has repeatedly stated in its decisions on the issue of benchmarks, sentencing benchmarks are not to be interpreted or applied in a manner that places "hard and fast restrictions" on the scope of the sentencing court's authority in any given case. Because the proper sentence in any given case can not be determined "with mathematical certainty", appellate courts should not impose bright-line rules that allow no exceptions for unusual cases, nor should appellate courts make before-the-fact pronouncements concerning the "correct" sentence that must invariably be imposed on particular categories of offenders, or that must invariably be imposed for particular categories of offenses.

---

**22.** Quoting *Wentz*, 805 P.2d at 966.

**23.** AS 12.55.005 declares that the goals of sentencing are:

> (1) the seriousness of the defendant's present offense in relation to other offenses;
> (2) the prior criminal history of the defendant and the likelihood of rehabilitation;
> (3) the need to confine the defendant to prevent further harm to the public;

> (4) the circumstances of the offense and the extent to which the offense harmed the victim or endangered the public safety or order;
> (5) the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct;
> (6) the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms; and
> (7) the restoration of the victim and the community.

In other words, even though the goal of protecting the public is important, there are times when it is simply improper for a court to ignore other sentencing goals, and other facets of the case, when sentencing a defendant for multiple crimes.

As this Court acknowledged in our post–*Hodari* decision, *Brown v. State*, 4 P.3d 961 (Alaska App.2000):

> In *Hodari* and ... *Wentz*, the supreme court admonished this court not to interpret or apply benchmark ranges inflexibly. The [supreme] court stressed that any sentencing decision ultimately must be justified on the particular facts of a defendant's offense and background, evaluated in light of the range of sentences authorized by the legislature for that offense. Thus, the supreme court warned, appellate courts should not "rely too heavily on appellate review to articulate sentencing principles and to fine-tune sentences [by] anticipat[ing] what other factual situations might arise in the future [or by] fashion[ing] rules prospectively".
>
> In *Williams* ..., this court responded to the supreme court's concerns. We clarified that benchmark ranges were intended to serve only as "starting points" for sentencing analysis, not "hard and fast limits" on a judge's sentencing discretion. We explicitly rejected the notion that sentencing judges could deviate from a benchmark range "only when certain specific, limited exceptions are established". Rather, we stressed that a sentencing judge could properly rely on "any sound reason" to deviate up or down from the benchmark.

*Brown*, 4 P.3d at 963 (footnotes omitted).

■ As we noted earlier, we have repeatedly interpreted and applied the *Neal–Mutschler* rule as a bright-line sentencing rule that imposes a strict and unvarying boundary on a sentencing judge's discretion. But this view of the *Neal–Mutschler* rule is fundamentally inconsistent with the principles enunciated by the supreme court in *Wentz, Bumpus*, and *Hodari*. We now hold that the *Neal–Mutschler* ceiling is simply a starting point or guide for analyzing the proper severity of a defendant's composite sentence—and that a composite sentence greater than the *Neal* ceiling can sometimes be justified by sentencing goals other than the particular goal of protecting the public.

■ Our remaining task is to evaluate Judge Hanley's sentencing decision in Phelps's case in light of our holding.

As we explained in the earlier portion of this opinion where we detailed Judge Hanley's findings at the sentencing hearing, Judge Hanley found that Phelps's indecent exposure offenses were among the most serious, and that a maximum sentence was appropriate for these offenses—*i.e.*, 1 year's imprisonment. Phelps does not dispute this conclusion. Thus, the only remaining issue is whether there was sufficient justification for Judge Hanley's decision to impose a consecutive 180 days to serve (*i.e.*, an additional 6 months) for Phelps's separate offense of failure to appear.

Obviously, Phelps's decision to abscond in the middle of his trial was a completely separate criminal episode from the acts of indecent exposure that he was charged with. And, as we noted earlier in this opinion, Alaska courts have recognized that a defendant should normally receive consecutive jail time for the crimes of escape or failure to appear. *See Walton v. State*, 568 P.2d 981, 986 (Alaska 1977); *Hayes v. State*, 790 P.2d 713, 717 (Alaska App.1990).

In *Walton*, our supreme court observed that the "goals of sentencing ... would be largely frustrated if no real or effective additional sanction or detriment flowed from [a defendant's] conviction [for] escape [while incarcerated for another crime]." 568 P.2d at 986. And in *Hayes*, this Court stated that, "[i]n general, where a defendant commits the crime of escape or failure to appear, there is a strong argument for the imposition of a consecutive sentence." 790 P.2d at 717.

In Phelps's case, as Judge Hanley indicated in his sentencing remarks, Phelps's act of failing to appear was not a "garden-variety" example of this crime—for instance, a failure to appear at a pre-trial conference or calendar call that was soon remedied. Instead, Phelps's failure to appear was significantly more serious: he absconded during his trial (after he was confronted with strong evi-

dence against him), and he remained a fugitive for more than 15 years.

Judge Hanley concluded that Phelps's failure to appear was serious for a separate reason: the effect that it had on the victim of his underlying offenses and on her older sister, who testified that Phelps also abused her. Judge Hanley found that, because the criminal prosecution against Phelps remained unfinished for fifteen years, the emotional problems that the victim and her sister experienced as a result of Phelps's underlying acts of indecent exposure were exacerbated and prolonged.

Judge Hanley then noted that, unless he imposed some additional jail time for Phelps's crime of failure to appear, "it [would] be as if nothing ever happened [to Phelps] because of it." Accordingly, Judge Hanley concluded that the sentencing goals codified in AS 12.55.005 would affirmatively be frustrated unless Phelps received some amount of consecutive imprisonment for the crime of failure to appear.

AS 12.55.005 declares that the two paramount purposes of sentencing law are "the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences", as evaluated under the seven sentencing goals listed in the statute. Given the facts of Phelps's failure to appear, and given Judge Hanley's unchallenged conclusion that Phelps's acts of indecent exposure (considered by themselves) merited a 1–year term of imprisonment, we agree with Judge Hanley that, unless Phelps received an additional term of imprisonment for his fail-

ure to appear, this would create an unjustified sentencing disparity and would frustrate the goal of reasonable uniformity in sentencing.

Given the facts of this case, Judge Hanley could reasonably conclude that, even though the sentencing goal of protecting the public might have been satisfied by a sentence of only 1 year, other sentencing goals codified in AS 12.55.005 would remain unsatisfied: the reasonable assessment of the seriousness of Phelps's offenses in relation to other offenses; the extent to which Phelps's conduct harmed the victim; the effect of the sentence in deterring other members of society from similar criminal conduct; and the effect of the sentence as a reflection of the community's condemnation of the criminal act and as a reaffirmation of societal norms.

For these reasons, Judge Hanley had sufficient reasons to impose a sentence that exceeded the *Neal* ceiling. And, given the totality of Phelps's conduct, we conclude that Phelps's composite sentence of 545 days to serve is not clearly mistaken.[24]

*Conclusion*

The sentencing decision of the district court is AFFIRMED.

---

**24.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).